[S. F. No. 23932. Sept. 14, 1979.]

In re Determination of Rights to WATERS
OF LONG VALLEY CREEK STREAM SYSTEM.
EUGENE A. ROWLAND et al., Petitioners and Respondents, v.
DONALD E. RAMELLI, Claimant and Appellant;
STATE WATER RESOURCES CONTROL BOARD, Respondent.

342

COUNSEL

Adolph Moskovitz, Stephen A. Kronick and Kronick, Moskovitz, Tiedemann & Girard for Claimant and Appellant.

No appearance for Petitioners and Respondents.

Evelle J. Younger and George Deukmejian, Attorneys General, R. H. Connett, Assistant Attorney General, Roderick Walston and Richard C. Jacobs, Deputy Attorneys General, for Respondent.

Porter A. Towner, Russell R. Kletzing and David B. Anderson as Amici Curiae on behalf of Respondent.

OPINION

**MOSK, J.**—The significant problem in this case is the extent to which the State Water Resources Control Board (Board) has the power to define and otherwise limit prospective riparian rights when, pursuant to the statutory adjudication procedure set forth in Water Code section 2500 et seq., it determines all claimed rights to the use of water in a stream system. We conclude that the Legislature, in order to foster more reasonable and beneficial uses of state waters, has granted the Board broad authority to ascertain the nature of future riparian rights in this adjudication procedure. In delimiting the scope of this authority, however, we are guided by prudential considerations to apply the presumption that the Legislature does not intend a statute to raise substantial constitutional questions that may result in total or partial invalidation of the enactment, unless a contrary intention is clearly expressed. This case presents such a constitutional issue with respect to the Board's determination to extinguish a riparian landowner's future right to the use of water.

In *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489 [45 P.2d 972], we held that section 11 of the Water Commission Act violated article X, section 2, of the California Constitution; section 11 deemed riparian rights remaining unused for 10 consecutive years to be abandoned and thereby provided for their complete extinction. The serious constitutional question raised by the *Tulare* holding is whether the Legislature may authorize the Board to extinguish altogether future

riparian rights absent a showing that less drastic limitations on those rights are insufficient to promote the most reasonable and beneficial uses of state waters. Thus, although the Board has broad authority to define and otherwise limit future riparian rights, we conclude the Legislature did not intend to authorize the complete extinction of any future riparian rights in circumstances in which the Board has failed to establish that the most reasonable and beneficial use of waters subject to the adjudication proceeding could not be promoted as effectively by placing other less severe restrictions on such rights.

The action arises out of a statutory proceeding to adjudicate the rights of all claimants to the waters of the Long Valley Creek Stream System (stream system) in Lassen, Sierra and Plumas Counties. The stream system, which contains a 465-square-mile watershed, lies astride the California-Nevada border starting at its uppermost extremity about 8 miles northwest of Reno, Nevada, and extending northwesterly about 45 miles in length to the east end of Honey Lake near Herlong, California. Long Valley Creek and its main tributaries, Purdy Creek and Balls Creek, originate in the melting snow of the Sierra Nevada near Babbit Peak. From there they flow into a semiarid and desert portion of California. In most years, there is a surplus of water early in the spring, with the flow receding rapidly when the snow has melted; this may occur as early as April or as late as June. After the snow-melt runoff is depleted, there is only enough water to irrigate a small portion of the total irrigable land.

Because of the limited water supply, there has been prolific litigation among the various water claimants in the area since at least 1883. In the interest of resolving the conflicts that have fostered such litigation, nine claimants filed a petition in 1966 with the Board for statutory adjudication of all water rights in the stream system. (Wat. Code, § 2525.) The staff of the Board conducted a preliminary investigation and recommended in favor of the petition, which the Board subsequently granted. Thereafter the Board prepared and published a notice of the proceedings (*id.,* §§ 2526, 2527), and all persons claiming a right to the waters of the stream system notified the Board of their intention to file a claim. (*Id.,* § 2528.) As required by Water Code section 2550, the Board then conducted an extensive investigation; it published a report containing the results of this investigation for the principal purpose of assisting water users in filing their claims of right.

After filing its report, the Board advised persons who notified it of their intention to file a claim that the claim and proof in support of it must be

formally presented.[1] It heard 234 claims and proofs, and 42 contests thereto, concerning the rights of the stream system. After consideration of these claims, proofs and contests, it "entered of record in its office an order determining and establishing the several rights to the water of the stream system." (*Id.,* § 2700.)

Donald Ramelli (Ramelli), as a party aggrieved or dissatisfied with the order of determination, filed a notice of exceptions in the superior court pursuant to Water Code section 2757. Ramelli owns land upon which Balls Creek originates. For the past approximately 60 years he and his predecessors have irrigated 89 acres of this land, but before the Board he claimed prospective riparian rights in the creek for an additional 2,884 acres. The order of determination nevertheless awarded him various amounts of water for only the 89 acres as to which he was currently exercising his riparian rights; it extinguished entirely his claim as a riparian landowner to the future use of water with respect to the remaining 2,884 acres.[2]

The trial court denied Ramelli's exceptions and entered a decree consistent with the Board's order of determination. Ramelli appealed from the decree, and we reverse.

I

Ramelli's principal contention is that the trial court erroneously failed to recognize his riparian right to prospective use of the stream system. In

[1]Former Water Code section 2575 required the Board to provide such notice to water rights claimants. (Stats. 1965, ch. 53, § 3, pp. 934-935.) This section was in effect at the time of this investigation and therefore is here applicable.

In 1976, the Legislature revised the procedure to be followed when the Board conducts field investigations and receives proofs of claims. (Wat. Code, §§ 2550-2557; Stats. 1976, ch. 545, §§ 4-7, pp. 1382-1384.) The revised procedure provides inter alia that (1) claimants have a duty to be present at some time during the investigation either in person or by an agent (Wat. Code, § 2551) and to have information available concerning the extent and nature of their claim (*id.,* § 2552), and (2) proofs of claims shall be filed at the conclusion of the investigation or shortly thereafter (see *id.,* §§ 2553, 2575-2577). Under both the earlier and the revised procedures, the failure to submit a proof of claim bars a claimant "from subsequently asserting any rights theretofore acquired upon the stream system" and operates as a forfeiture of "all rights to water theretofore claimed by him on the stream system, other than as provided in the decree. . . ." (*Id.,* § 2774.)

[2]Presently only an estimated 4,130 acres are irrigated in the entire Long Valley Creek watershed area. Moreover, Balls Creek contributes to Long Valley Creek the largest flow of any of its tributaries. Thus, the trial court found that under the circumstances "To allow dormant riparian owners to cast a shadow over uses of water by established developments would not only be unequitable but would create chaos."

support of this contention, he initially insists that California judicial decisions have without question recognized such a right.

 It is true that a substantial body of case law concerning a riparian's prospective rights has developed in this state as a result of private lawsuits between various water rights claimants. Thus, for example, this court has recognized that (1) the rights of a riparian owner are not destroyed or impaired by the fact that he has not yet used the water upon his riparian lands, and therefore that the riparian right exists, whether exercised or not (*Lux* v. *Haggin* (1886) 69 Cal. 255, 390-391 [4 P. 919, 10 P. 674]; *Half Moon Bay Land Co.* v. *Cowell* (1916) 173 Cal. 543, 551 [160 P. 675]; *Parker* v. *Swett* (1922) 188 Cal. 474, 480 [205 P. 1065]; *Meridian, Ltd.* v. *San Francisco* (1939) 13 Cal.2d 424, 445 [90 P.2d 537, 91 P.2d 105]); (2) a dormant riparian right is paramount to active appropriative rights (*Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351, 374-375 [40 P.2d 486]); and (3) in resolving a dispute between a riparian who claims a prospective water right and other claimants, it may be proper for the trial court to retain jurisdiction over the matter so that the riparian's prospective right can be quantified at the time he decides to exercise it (*Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) *supra,* 3 Cal.2d 489, 525; *Meridian, Ltd.* v. *San Francisco* (1939) *supra,* 13 Cal.2d 424, 452; *Williams* v. *Rankin* (1966) 245 Cal.App.2d 803, 819 [54 Cal.Rptr. 184]; *Tehachapi-Cummings County Water Dist.* v. *Armstrong* (1975) 49 Cal.App.3d 992, 998 [122 Cal.Rptr. 918]).

Such principles, however, are limited in their application to a context in which water rights are determined through piecemeal adjudication that will settle disputes among only a small number of those persons who claim a right to the use of water in a stream system. The judgment in this type of adjudication necessarily can bind only those who are parties to the litigation; it may subsequently be nullified by the assertion of a legitimate claim by a water user on the stream who was not a party to the suit. The most that a trial court can do in such a case, therefore, is to retain jurisdiction over prospective riparian claims.

This court has never declared that the foregoing approach is to be preferred over a statutory procedure for the comprehensive determination of *all* rights to the use of water in a stream system; rather, we have recognized that there is a limitation inherent in the ability of private lawsuits to provide clarity, certainty, and security to water rights and water users. Thus, in *Meridian, Ltd.* v. *San Francisco, supra,* 13 Cal.2d at page 457, we stated that "This method of resolving controversies

involving the rights of the users of water on the river is necessarily piecemeal, unduly expensive and obviously unsatisfactory." Our analysis of the nature of the prospective riparian right in this context therefore does not imply that the Legislature may not define or otherwise limit the scope of such a right, or delegate to the Board the authority to do so in a statutory adjudication proceeding.[3]

Ramelli contends, however, that neither the legislatively established statutory adjudication procedure nor article X, section 2, of the California Constitution permits the Board to determine that a riparian's unquantified prospective claim may constitute an unreasonable use and therefore should be quantified, subordinated to existing uses, or eliminated entirely. Thus, Ramelli argues the trial court's decree should be reversed because it sustained the Board's determination that in this case the reasonable and beneficial use of the waters in the stream system would best be promoted by extinguishing altogether his unexercised riparian right. In examining this contention, we first consider whether the Legislature in establishing the statutory adjudication procedure has authorized the Board to determine the nature of a riparian's prospective right.

 Water Code section 2501 provides that "The board may determine, in the proceedings provided for in this chapter, *all* rights to water of a stream system whether based upon appropriation, *riparian right,* or other basis of right." (Italics added.) Section 2769 further states that "The decree shall *in every case* declare as to the water right adjudged *to each party,* the priority, amount, season of use, purpose of use, point of diversion, and place of use of the water . . . ." (Italics added.) It is a settled principle in California law that "When statutory language is thus clear and unambiguous there is no need for construction, and courts should not indulge in it." (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].) The above statutory language clearly discloses that the Legislature intended to grant the

---

[3]Ramelli also asserts that these common law cases disclose his future right to an unquantified amount of water has become "vested." The assertion is without merit. As discussed *post,* riparian rights are limited by the concept of reasonable and beneficial use, and they may not be exercised in a manner that is inconsistent with the policy declaration of article X, section 2, of the Constitution. Thus, to the extent that a future riparian right may impair the promotion of reasonable and beneficial uses of state waters, it is inapt to view it as vested.

Board broad authority pursuant to the statutory adjudication procedure to define and otherwise limit the scope of a riparian's future right.[4]

In delimiting the scope of this authority, however, we must also consider another well-established principle of statutory construction: that is, if " 'the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution.' [Citations.]" (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669].) It follows from this principle that in cases in which a statute is readily susceptible of an interpretation that will render unnecessary the resolution of a substantial constitutional issue, courts should presume the Legislature intended the statute to be construed in a fashion that would avoid the issue and consequently the risk of judicial invalidation, unless a contrary intention is clearly expressed.

The most recent declaration of the foregoing presumption was made by the United States Supreme Court in *National Labor Relations Board* v. *Catholic Bishop of Chicago* (1979) 440 U.S. 490, 500-501 [59 L.Ed.2d 533, 541, 99 S.Ct. 1313]. In that case the court examined whether Congress

---

[4]Our construction of the clear language of the statute is further supported by the code commission note to section 2501. The commission stated: "The provision codified here was added by the 1935 amendment to § 25 which prior thereto consisted of only one sentence. The effect of the 1935 amendment was to expand the scope of statutory adjudications to include *all* classes of water rights rather than only rights based upon appropriation. *Throughout this chapter language restricting the operation of the various provisions codified to rights by appropriation will be deleted to conform to the change thus made in 1935.*" (Cal. Code Com. note to Wat. Code, § 2501, 68 West's Ann. Wat. Code (1971 ed.) p. 446, italics added.)

Our construction is also consistent with the well-established practice of the Board and its predecessor in the administration of the statutory adjudication procedure. The decisions in statutory adjudication proceedings since 1935 show that the responsible governmental agency "has consistently interpreted section 2500 et seq. to require all riparian rights be fixed in its orders of determination. This is significant because of the longstanding rule that the 'contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized.' (*Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1].)" (*In re Waters of Soquel Creek Stream System* (1978) 79 Cal.App.3d 682, 689 [145 Cal.Rptr. 146].)

Finally, the construction promotes the general policy of the Water Code, which expresses the concerns articulated in article X, section 2, of the California Constitution, "that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare." (Wat. Code, § 100; see *post.*)

intended to grant the National Labor Relations Board (NLRB) the authority to order church schools that taught both religious and secular subjects to cease unfair labor practices and to bargain collectively with the unions. In concluding that the National Labor Relations Act did not confer jurisdiction on the NLRB to make such orders, the court began its opinion by stating: "In keeping with the Court's prudential policy it is incumbent on us to determine whether the [NLRB's] exercise of its jurisdiction here would give rise to serious constitutional questions. If so, we must first identify 'the affirmative intention of Congress clearly expressed' before concluding that the Act grants jurisdiction." (*Id.*) Thus, although in this case it is clear that the Legislature intended to grant the Board broad authority to determine the nature and scope of water rights pursuant to the statutory adjudication procedure, we presume this grant does not authorize the Board to place limitations on future riparian rights that would raise serious constitutional questions and thereby create a substantial risk of judicial invalidation, unless the statute reveals a clearly expressed contrary intention.

In this case the Board entirely extinguished Ramelli's riparian claim to the future use of water. Such extinction raises a substantial constitutional issue as a result of our holding in *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) *supra*, 3 Cal.2d 489, 531, that section 11 of the Water Commission Act violated article X, section 2 (formerly art. XIV, § 3); the section, as stated above, provided in essence for the complete extinction of riparian rights that remained unused for 10 consecutive years. We consequently decline to construe the statutory adjudication procedure as authorizing the Board to extinguish altogether future riparian rights.[5] Our analysis will entail an examination of (1) the nature of the constitutional grant of legislative authority to promote state water policy by enacting laws that may inter alia result in the imposition of substantial limitations on future riparian rights, and (2) the serious constitutional question raised by the *Tulare* case concerning whether such rights may be completely extinguished.

---

[5]Despite the open-ended nature of its grant of authority to the Board, the Legislature did not clearly and affirmatively express an intention contrary to our construction of the statute. Although Water Code section 2769 expressly provides that in defining the rights of each party the Board shall determine the "priority, amount, season of use, purpose of use, point of diversion, and place of use of the water," neither that section nor any other section creating the adjudication procedure states that the Board may completely extinguish any type of right. Thus, once it is established that complete extinction of a future riparian right raises a serious constitutional issue, it follows that the statute should be construed as not authorizing such extinction.

A

■ Article X, section 2, acknowledges that in California a riparian landowner has historically possessed a common law right to the future use of water in a stream system. The provision does so by declaring that "The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be *reasonably required for the beneficial use to be served* . . ." and that "Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, *or may be made adaptable,* in view of such reasonable and beneficial uses . . . ." (Cal. Const., art. X, § 2, italics added.)

As the above language also discloses, however, riparian rights are limited by the concept of reasonable and beneficial use. Moreover, they must not be exercised in a manner that is inconsistent with constitutional policy provisions that are to govern interpretations of water rights in California. In light of these policies and of the constitutional intent to limit unduly expansive interpretations of water rights that would contravene them, it becomes clear that article X, section 2, enables the Legislature to exercise broad authority in defining and otherwise limiting future riparian rights, and to delegate this authority to the Board.

Article X, section 2, declares that "because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare." The provision nowhere suggests that the public interest or general welfare requires the elevation of riparian rights, future or otherwise, to a level of equal or superior constitutional protection. Rather, in accordance with its policy declaration, the provision further states that the right to water, or to its use or flow, shall be *limited* to reasonable beneficial uses. It thereby inhibits judicial interpretations of water rights that are inconsistent with its goals. Moreover, the provision explicitly authorizes the Legislature to "enact laws in the furtherance of the policy in this section contained." (Cal. Const., art. X, § 2.) This authorization discloses that the framers of article X, section 2, recognized that the promotion of its salutary policies

would require granting the Legislature broad flexibility in determining the appropriate means for protecting scarce state water resources.[6]

Our conclusion that article X, section 2, does not preclude legislative or administrative determinations with respect to the nature of future riparian rights becomes even more readily apparent upon examination of the history of the provision. Article X, section 2, was adopted by amendment in 1928.[7] It was a direct response to the decision by this court

[6]The importance of broad legislative authority for the conservation and regulation of scarce water resources has also been recognized by courts in other states. For example, in *Belle Fourche Irrigation District* v. *Smiley* (1970) 84 S.D. 701 [176 N.W.2d 239], the South Dakota Supreme Court upheld a statute that recognized riparian rights as vested only " 'to the extent of the existing beneficial use' "; the court reasoned that the statute was an appropriate exercise of the state's power to provide for the "maximum utilization of the water resources of the state." (*Id.,* at p. 245.) In *State* v. *Knapp* (1949) 167 Kan. 546 [207 P.2d 440], the Kansas Supreme Court sustained a statute that inter alia (1) limited vested riparian rights to those uses actually instituted at the time the legislation was enacted or within three years prior thereto, and (2) required approval from the state for the commencement of any further uses. (See also *Brown* v. *Chase* (1923) 125 Wash. 542 [217 P. 23, 26] [water of nonnavigable stream subject to appropriation when riparian cannot use it beneficially, "either directly or prospectively, within a reasonable time"]; *In re Hood River* (1924) 114 Ore. 112 [227 P. 1065, 1084] ["state may change its common-law rule as to every stream within its dominion, and permit the appropriation of the flowing water for such purposes as it deems wise"]; c.f. *Baeth* v. *Hoisveen* (N.D. 1968) 157 N.W.2d 728, 732 [no absolute ownership of groundwater that has not actually been diverted and applied to a beneficial use]; *Knight* v. *Grimes* (1964) 80 S.D. 517 [127 N.W.2d 708, 711] [right to take and use percolating groundwater does not constitute actual ownership prior to withdrawal]; *Williams* v. *City of Wichita* (1962) 190 Kan. 317 [374 P.2d 578, 589], app. dism. (1963) 375 U.S. 7 [11 L.Ed.2d 38, 84 S.Ct. 46] [legislature may change principles of common law and abrogate decisions made thereunder when in its opinion it is necessary to the public interest]; *Baumann* v. *Smrha* (D.Kan. 1956) 145 F.Supp. 617, 624, affd. 352 U.S. 863 [1 L.Ed.2d 73, 77 S.Ct. 96] [state has power "to modify or reject the doctrine of riparian rights because unsuited to the conditions in the state and to put into force the doctrine of prior appropriation and application to beneficial use or reasonable use"].)

[7]In its entirety, the amendment provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall

in *Herminghaus* v. *Southern California Edison Co.* (1926) 200 Cal. 81 [252 P. 607], which held that a downstream riparian's right against an inferior upstream appropriator permits him to command the entire flow of the stream to flood his pastureland.[8] (*Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673, 699-700 [22 P.2d 5]; Governor's Com. to Review Cal. Water Rights Law, Riparian Water Rights in Cal. (Nov. 1977) p. 52.) Thus, we have observed that the purpose of the amendment was " 'to prevent the waste of waters of the state resulting from an interpretation of our law which permits them to flow unused, unrestrained and undiminished to the sea,' and is an effort 'on the part of the state, in the interest of the people of the state, to conserve our waters' without interference with the beneficial uses to which such waters may be put by the owners of water rights, including riparian owners." (*Gin S. Chow* v. *City of Santa Barbara, supra,* 217 Cal. at p. 700.)[9] We consequently find no support in the language or history of the amendment for the view that it was intended to preclude the Legislature from authorizing the Board in a statutory adjudication proceeding to determine the nature of future riparian rights. Rather, such a grant of authority is entirely consistent with the mandate of the amendment to the extent that it promotes the public interest by fostering more reasonable and beneficial uses of state waters.

We next examine whether such a broad grant of authority to the Board is consistent with the constitutional holding of *Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d 489. Ramelli argues that a riparian's prospective right cannot be defined or otherwise limited in a statutory proceeding because of our holding in *Tulare* that section 11 of the Water Commission Act—which declared that 10 years' nonuse, without an intervening use, constituted an abandonment of a riparian right—was

---

be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

[8]*Herminghaus* was an application of earlier decisions by this court holding that (1) a riparian's right against an inferior appropriator was not limited to the reasonable use of water actually applied to the land (*Miller & Lux* v. *Madera Canal etc. Co.* (1909) 155 Cal. 59, 64 [99 P. 502], disapproved in *Peabody* v. *City of Vallejo* (1935) *supra,* 2 Cal.2d at p. 368) and (2) a riparian may command the entire flow of the stream against such an appropriator regardless of his current needs. (*Huffner* v. *Sawday* (1908) 153 Cal. 86, 91 [94 P. 424].)

[9]Moreover, in 1927 a joint committee of the Senate and Assembly, which was attempting to devise a legal solution to the problems confronting Californians with respect to water storage, irrigation, and related subjects, found "that there is imperative need that the limits of the right of an owner of riparian land should be set" and "that prevention of a wasteful use of water is a matter of paramount importance to the general welfare of the State." (Rep. of the Joint Com. of the Sen. and Assem. for an Intensive Study of the Water Resources of Cal. and the State Engineer's Coordinated Plan for their Development (1927) p. 11.)

"incongruous and in violation of the spirit of the constitutional provision . . . ." (*Id.*, at p. 531.) Ramelli's expansive reading of the limits of *Tulare* places on legislative authority is unsupportable in light of the amendment's grant of authority to the Legislature to enact laws in the furtherance of the constitutionally expressed state water policy. Moreover, *Tulare* is distinguishable from the issue before us in that the statute therein treated the right as automatically abandoned as a result of 10 years' nonuse, without consideration of other needs and uses of the water in the stream system. The statute therefore was inconsistent with the mandate of the amendment to promote the reasonable beneficial use of state waters.

It is well established that what is a reasonable use of water varies with the facts and circumstances of the particular case. (*Tulare*, at p. 567 of 3 Cal.2d; *Gin S. Chow* v. *City of Santa Barbara, supra*, 217 Cal. 673, 706.) And it appears self-evident that the reasonableness of a riparian use cannot be determined without considering the effect of such use on all the needs of those in the stream system (*Tulare*, at p. 524 of 3 Cal.2d), nor can it be made "*in vacuo* isolated from statewide considerations of transcendent importance." (*Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140 [60 Cal.Rptr. 377, 429 P.2d 889].) These statewide considerations are that "limited water resources be put only to those beneficial uses 'to the fullest extent of which they are capable,' that 'waste or unreasonable use' be prevented, and that conservation be exercised 'in the interest of the people and for the public welfare.' (Cal. Const., art. XIV, § 3 [now art. X, § 2].)" (*Id.*, at p. 141.) Thus, we have concluded that there can no longer be any property right in the unreasonable use of water. (*Id.*, at p. 145.) In light of these considerations, it is clear that Ramelli's extravagant reading of our decision in *Tulare* to strike down section 11 of the Water Commission Act would unduly restrict the Legislature's authority to promote the reasonable and beneficial use of state waters and thereby would contravene article X, section 2.

This conclusion is supported by compelling policy considerations. The Legislature has enacted a comprehensive administrative scheme for the final determination of *all* rights in a stream system. (Wat. Code, § 2500 et seq.) The statutory adjudication procedure involves a complex balancing of both public and private interests, with the final decree assuring certainty to the existing economy and reasonable predictability to the uses of water in a stream system. In so doing, it falls within the amendment's specific grant of authority to the Legislature. (Cal. Const., art. X, § 2.) That the statutory adjudication procedure promotes the policies of the

amendment is reflected in a recent report of the Governor's Commission To Review California Water Rights Law. (Final Rep. (Dec. 1978).) This document identifies uncertainty as one of the major problems in contemporary California water rights law (*id.,* at pp. 16-49), and it discloses that riparian rights are a principal source of this uncertainty. (*Id.,* at pp. 18-21.)[10]

Uncertainty concerning the rights of water users has pernicious effects. Initially, it inhibits long range planning and investment for the development and use of waters in a stream system. (Robie & Steinberg, *Existing Water Laws and Industry Practices: Their Contribution to the Waste of Water* (1977) 53 L.A. Bar J. 164, 171-172; Governor's Com. to Review Cal. Water Rights Law, Final Rep. (Dec. 1978) *supra,* at p. 16.) Thus with respect to dormant riparian rights, one authority has observed: "These rights constitute the main threat to nonriparian and out-of-watershed development, they are the principal cause of insecurity of existing riparian uses, and their presence adds greatly to the cost of obtaining firm water rights under a riparian system. They are unrecorded, their quantity is unknown, their administration in the courts provides very little opportunity for control in the public interest. To the extent that they may deter others from using the water for fear of their ultimate exercise, they are wasteful, in the sense of costing the economy the benefits lost from the deterred uses." (Trelease, *A Model State Water Code for River Basin Development* (1957) 22 Law & Contemp. Prob. 301, 318; see also Milliman, *Water Law and Private Decision-making: A Critique* (1959) 2 J. Law & Econ. 41, 47.)

Uncertainty also fosters recurrent, costly and piecemeal litigation. In the present case, for example, there has been incessant litigation between the claimants to the waters of the stream system since about 1883. And, as the Board engineer observed, the inconclusive fragmentary definition of

---

[10]The uncertainty arises because of the nature of a riparian right. Such a right has traditionally not been viewed as an entitlement "to a specific quantity of water; rather, riparian owners on a stream are entitled to make a reasonable use of a correlative share of the stream flow. What a riparian's actual entitlement is at any given time varies with the circumstances of the time and place. A new riparian use, from either a recent patent of riparian land, a recent activation of a hitherto dormant riparian right, or the expanded use of an active riparian right, is entitled to share equally with all earlier riparian users." (Governor's Com. To Review Cal. Water Rights Law, Final Rep. (Dec. 1978) *supra,* at p. 20.) Thus, because all riparians must share water with one another on an equal or correlative basis, the other riparians can never know what their share will be in the future.

Moreover, "As against an appropriator, a riparian owner is accorded a fixed priority of right. But the quantity of water to which the right attaches remains unfixed. Thus, an expanded riparian use has the potential to preempt an inferior appropriative right where the supply of water originally was sufficient to satisfy both uses." (*Id.,* at p. 21.)

water rights resulting from that litigation was "the prime reason for the proposed adjudication." The principal cause of this untoward effect appears to be that a private suit for determining title to water binds only those who are parties to the suit; such suits are inadequate, however, because shortages in supply or new appropriations or riparian uses have the potential for bringing all water users on the stream in conflict. (Governor's Com. To Review Cal. Water Rights Law, Final Rep. (Dec. 1978) *supra*, at p. 22.)[11]

Finally, uncertainty impairs the state's administration of water rights. "Lack of knowledge of water use by non-statutory right holders affects decisions to grant permits, because the availability of water for appropriation and the existence and extent of other beneficial uses of water are uncertain. It also affects the ability of the Board to set meaningful terms and conditions to provide effective enforcement and protection of statutory water rights." (*Id.*, at p. 22.)[12]

These pernicious effects of uncertainty provide strong support for the conclusions of the Governor's Commission To Review California Water

---

[11]Another illustration of this pernicious effect is provided by the disputes among water users in the Kings River Valley. Litigation on the Kings River began in the drought year of 1876. By 1902, at least 103 suits to settle water rights disputes had been filed in the courts of Kings, Fresno, and Tulare Counties. For a discussion of the problems in this and other water basins, see Governor's Commission To Review California Water Rights Law, Final Report, *supra*, at pages 22-25.

[12]The need for certainty in the administration of state water rights is readily apparent when one examines the statutory framework governing appropriative rights in California. (Wat. Code, § 1200 et seq.) This framework sets forth inter alia a comprehensive procedure for the acquisition of a permit to use water subject to appropriation, and it evinces the Legislature's determination that the promotion of the policies expressed in article X, section 2, and Water Code section 100 requires the Board to evaluate whether the proposed appropriation is in fact a reasonable and beneficial use of scarce water resources. Thus, before granting a permit, the Board must "consider the relative benefit to be derived from (1) all beneficial uses of the water concerned including, but not limited to, use for domestic, irrigation, municipal, industrial, preservation and enhancement of fish and wildlife, recreational, mining and power purposes, and any uses specified to be protected in any relevant water quality control plan, and (2) the reuse or reclamation of the water sought to be appropriated, as proposed by the applicant." (*Id.*, § 1257.) The Board is also required to "reject an application when in its judgment the proposed appropriation would not best conserve the public interest" (*id.*, § 1255); and even when it decides that the grant of an application is proper, it cannot make such a grant without imposing "such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest the water sought to be appropriated." (*Id.*, § 1253.) Obviously, the Board will be better able to make these assessments if it can ascertain the nature and scope of other persons' potential rights to the use of water. An open ended future riparian right impairs the Board's ability to make such determinations and thus exacerbates the problems created by uncertainty with respect to the administration of water rights.

Rights Law, that comprehensive determination of water rights has salutary results because it (1) provides "valuable information for water rights administration and for planning purposes," (2) "prevents recurrent litigation and gives the certainty of official recognition to private property rights," and (3) creates "the basis for the orderly control and management of water on a stream." (*Id.,* at p. 28.)[13] Thus, we find unpersuasive Ramelli's argument that *Tulare* should be read as prohibiting the Board from defining or otherwise limiting future riparian rights.

## B

■ A more difficult question is whether the Board may constitutionally extinguish a riparian landowner's unexercised claim to the use of water. The Attorney General has not presented a persuasive argument for concluding that complete extinction of such rights is necessary to the promotion of the reasonable and beneficial use of a stream system, nor has he established in this case that the reasonable and beneficial use of the waters in the Long Valley Creek cannot be equally well promoted by placing limitations on Ramelli's future riparian right other than complete extinction. Indeed, when the Attorney General was asked at oral argument to explain why it was necessary to extinguish Ramelli's future claim rather than to promote state policy by imposing other less drastic limitations—such as the quantification of the future right, or assigning to it a lower priority than all present and future actual reasonable beneficial uses made prior to the riparian's attempted use—he responded, "the facts of this case . . . don't show any reasonable possibility whatsoever that any uses on Ramelli's land would be more reasonable than the uses which are currently in existence, and under these circumstances I think it's appropriate for the State Board to look at the geography, the soil type, the historical uses and to accept that as a reasonable basis for its order of determination."

The Attorney General's purported justification is dubious in light of *Tulare.* It is true that *Tulare* is distinguishable from this case; in *Tulare*

---

[13]Ramelli asserts that judicial retention of jurisdiction, rather than making a final and quantitative determination of water rights, best ensures that the waters of the state will be put to the most reasonable and beneficial use. He proposes that by retaining jurisdiction, a court can adjust over time, according to changes in the ownership of the land or in the ᴜse of the water on the land, the uses to which water may be put for the most reasonable and beneficial purposes. This contention is refuted by the above analysis. Moreover, while this court has recognized the benefits of judicial retention of disputes between water rights claimants, it has done so only with respect to private suits involving a limited number of parties, and not in the context of a statutory proceeding for determination of the rights of all claimants to the use of the water in a stream system.

the Legislature had enacted a blanket extinction of unexercised riparian rights when there was no basis for concluding that such an extinction was consistent with the promotion of the reasonable and beneficial use of state waters. In light of *Tulare's* holding that section 11 of the Water Commission Act was unconstitutional, however, we are reluctant to conclude that the Board may altogether extinguish a riparian's future claim when it has not been established that the imposition of other less drastic limitations on the claim would be less effective in promoting the most reasonable and beneficial use of the stream system. Because no such showing has been made in this case, it is clear that the Board's decision to extinguish Ramelli's future riparian claim raises a serious constitutional issue. Thus, since the Legislature has not clearly expressed an intention that the statute should be construed otherwise (see fn. 5, *ante*), we interpret it as not authorizing the Board in these circumstances to extinguish altogether Ramelli's claim to the future use of waters in the Long Valley stream system.[14]

■ For the future guidance of the Board, however, we undertake to identify the limitations on unexercised riparian claims that are constitutionally permissible and thus authorized by the statute in light of our analysis herein. As previously discussed, when the Board determines all rights to the use of the water in a stream system, an important interest of the state is the promotion of clarity and certainty in the definition of those rights; such clarity and certainty foster more beneficial and efficient uses of state waters as called for by the mandate of article X, section 2. Thus, the Board is authorized to decide that an unexercised riparian claim loses

[14]Ramelli also argues that article X, section 2, prevents the Board from quantifying such rights. In support of this argument, he cites a statement made by this court in *Tulare, supra*: "The new doctrine not only protects the actual reasonable beneficial uses of the riparian but also the prospective reasonable beneficial uses of the riparian. As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises. Therefore, as to such uses, the trial court, in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator." (3 Cal.2d at p. 525.) The contention is without merit. The statement in *Tulare* was made in the context of the adjudication of a private dispute among various water claimants. As noted earlier, such an adjudication is inherently limited in its impact because it cannot bind those who are not parties. It consequently would be inapt to view it as controlling in cases in which the Board must make a comprehensive determination of *all* rights to the use of a stream system in order to foster the most reasonable and beneficial uses of state waters. Moreover, to the extent that the court in *Tulare* otherwise recognized article X, section 2, as protecting a riparian's prospective needs (*id.*, at p. 531), its principal reason for doing so was to prevent the prescriptive taking of such future rights. (See *id.*, at p. 525.) Thus, it would also be inappropriate to read *Tulare* as limiting the Legislature's authority to provide for comprehensive administrative determinations that may affect the nature of prospective riparian rights, so long as the determination is consistent with the promotion of the reasonable and beneficial use of state waters as required by article X, section 2.

its priority with respect to all rights currently being exercised. Moreover, to the extent that an unexercised riparian right may also create uncertainty with respect to permits of appropriation that the Board may grant after the statutory adjudication procedure is final, and may thereby continue to conflict with the public interest in reasonable and beneficial use of state waters, the Board may also determine that the future riparian right shall have a lower priority than any uses of water it authorizes before the riparian in fact attempts to exercise his right. ▆▆ ▆▆▆▆ In other words, while we interpret the Water Code as not authorizing the Board to extinguish altogether a future riparian right, the Board may make determinations as to the scope, nature and priority of the right that it deems reasonably necessary to the promotion of the state's interest in fostering the most reasonable and beneficial use of its scarce water resources.[15]

## II

Ramelli also contends that a prior judgment involving several claimants to the waters of Balls Creek Evans v. Flagg, Sierra County Super. Ct. No. 2809) is res judicata in this proceeding, and that the Board and trial court erred in failing to recognize the water rights as declared in that judgment.

▆▆ It is well settled that a judgment is res judicata only against persons who were parties or in privity with parties thereto. (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 812 [122 P.2d 892].) Thus, for example, we have held that the Attorney General may bring an action in declaratory relief to determine whether a society held its assets for

---

[15]To the extent that *In re Waters of Soquel Creek Stream System* (1978) *supra,* 79 Cal.App.3d 682, conflicts with the views expressed herein, we disapprove it.

Moreover, it follows from the above discussion that although the Board's determination of water rights under the statutory adjudication procedure is deemed final after three years by section 2900, the section should not be interpreted so rigidly that it precludes the Board from reevaluating a future riparian right when the riparian owner actually proposes to exercise it, even though more than three years may have elapsed from the time of the adjudication procedure. Thus, in order to implement the fundamental water policies expressed in the Constitution and Water Code, we conclude that at any time after the statutory adjudication has taken place, the Board has the authority to evaluate the riparian's proposed use of his unexercised right in the context of other proposed uses of water in the stream system, and to determine whether the riparian use should be permitted in light of the state's interest in promoting the most efficient and beneficial use of state waters. Because the statutory adjudication procedure and section 2900 are designed to promote finality and certainty, however, the Board may not grant the unexercised riparian claim a priority with respect to existing rights that is higher than it granted at the time the decree became final.

charitable purposes, despite a prior determination between the society and one of its members that the assets were not held for such purposes. (*In re L. A. County Pioneer Society* (1953) 40 Cal.2d 852, 857 [257 P.2d 1].)

As previously discussed, the decree herein arises from a statutory proceeding by the Board for the determination of all rights to the use of the waters in a stream system. It results in a final and comprehensive determination of such rights in light of what constitutes a reasonable beneficial use under article X, section 2, and consequently it necessarily involves considerations that transcend those at stake in a private dispute between a limited number of parties. Moreover, as is apparent from these facts, a principal reason for the employment of such a procedure is the inconclusive and fragmentary nature of private water rights litigation. We therefore conclude the trial court was correct in rejecting Ramelli's assertion that the prior Evans v. Flagg judgment should be accorded res judicata effect. The Board was not a party in that action, nor did the judgment reflect the transcendent interests that must be considered in a comprehensive statutory adjudication proceeding.

The judgment is reversed for further proceedings consistent with this opinion.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the majority opinion to the extent that it reverses the trial court's judgment upholding a decision of the state Water Resources Control Board (Board) which entirely extinguished appellant's prospective riparian rights. I respectfully dissent, however, from that portion of the opinion which upholds the Board's authority to limit or "quantify" those prospective rights or to declare them subordinate to existing uses. It is my view that longstanding provisions of the state Constitution (art. X, § 2, formerly art. XIV, § 3) forbid the limitation, quantification or subordination of a riparian owner's prospective rights until he seeks to exercise those rights. While the applicable principles of law are fully and fairly stated in the majority opinion, unfortunately they are not applied to the facts of the present case.

As we explained many years ago, prior to November 1928, a riparian owner such as appellant was entitled to *all* of the waters of an adjoining

stream "regardless of any waste or surplus that might result from the exercise of such a right and regardless of any rule of reasonable use." (*Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351, 363 [40 P.2d 486]; see *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 524 [45 P.2d 972] [describing the former riparian right as a "vested property right"].) This riparian right was modified or limited in 1928 in one substantial respect by the adoption of former article XIV, section 3. Thereafter, riparian rights, and all other water rights, were (and presently are) limited to the use of such water as shall be reasonably required for the beneficial use to be served; these rights do not extend to the waste of water nor to any other unreasonable use or diversion of water. (*Peabody, supra,* at pp. 366-367; *Tulare, supra,* at pp. 524-525; see also Hutchins, The Cal. Law of Water Rights (1956) at pp. 12-16, 230-234; 1 Rogers & Nichols, Water for Cal. (1967) §§ 176 at p. 241, 341 at pp. 478-479 and fn. 1.)

Notwithstanding the announcement of the foregoing restrictions, former article XIV, section 3, reaffirmed the existence and continued vitality of *prospective* riparian rights, for it also provided that "Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, *or may be made adaptable,* in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use . . . ." (Italics added.)

Thus, with the proviso that any present use be reasonable and beneficial rather than wasteful, the 1928 provision preserved the riparian owner's present *and prospective* right of use. As the majority opinion itself expressly acknowledges, ". . . this court has recognized that . . . the rights of a riparian owner are not destroyed or impaired by the fact that he has not yet used the water upon his riparian lands, and therefore that the riparian right exists, whether exercised or not [citations] . . . ." (*Ante,* p. 347.) The precise extent of the constitutional protection afforded to riparian owners was carefully and unequivocally described by us in *Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d 489, 524-526, and in a substantial body of law expressed in an unbroken line of cases which have followed or approved its holding.

In *Tulare,* decided seven years after the adoption of the constitutional provision discussed above, we reversed a trial court judgment which had

elevated the riparian owners' rights above the appropriators' rights without regard to whether or not the riparian use was reasonable and beneficial. We determined that the 1928 amendment was applicable and modified the judgment accordingly. With respect to the riparian owners' future water use, we stated as follows: "The new [constitutional] doctrine not only protects the actual reasonable beneficial uses of the riparian *but also the prospective reasonable beneficial uses of the riparian.* As to such future or prospective reasonable beneficial uses, *it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises.* Therefore, as to such uses, the trial court, in its findings and judgment, should declare such prospective uses *paramount to any right of the appropriator.* By such declaratory judgment, the rights of the riparian will be fully protected against the appropriative use ripening into a right by prescription, but, until the riparian needs the water, the appropriator may use it, thus, at all times, putting all of the available water to beneficial uses. The trial court might well, by appropriate provisions in its judgment, retain jurisdiction over the cause, *so that when a riparian claims the need for water,* the right to which was awarded him under such a declaratory decree, *the trial court may determine whether the proposed new use, under all the circumstances, is a reasonable beneficial use and, if so, the quantity required for such use.*" (P. 525, italics added.)

Thus, *Tulare* stands for this one simple proposition: A riparian owner's unexercised right to future water use is *constitutionally* protected and cannot properly be limited, fixed, quantified or subordinated "until the need for such use arises." (*Ibid.*) I emphasize the fact that our *Tulare* decision not merely protects the riparian owner's prospective rights against total extinguishment, but also protects against premature limitation, quantification or subordination.

We have subsequently confirmed and approved our *Tulare* holding that a riparian owner's prospective water rights were and are preserved and protected by the 1928 constitutional amendment. We did so in our recent, exhaustive analysis of California water law in *City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 268 [123 Cal.Rptr. 1, 537 P.2d 1250]. (See also *City of L. A. v. City of Glendale* (1943) 23 Cal.2d 68, 75 [142 P.2d 289]; *Meridian, Ltd. v. San Francisco* (1939) 13 Cal.2d 424, 445 [90 P.2d 537, 91 P.2d 105]; *Hutchins, supra,* at p. 233; Rest.2d Torts, § 857, subd. (1), and com. (a), at pp. 250-251.) As we noted in *Glendale,* the amendment was designed primarily to modify the riparian owner's prior right to enjoin a use of water he did not presently need; the

amendment, however, did not destroy "a riparian right to meet future as well as present needs, . . ." (23 Cal.2d at p. 75.) There also is recent well reasoned appellate authority for this view in *In re Waters of Soquel Creek Stream System* (1978) 79 Cal.App.3d 682, 686-688 [145 Cal.Rptr. 146].

Given the clear constitutional basis for the protection and preservation of prospective riparian rights, as outlined in *Tulare* and its successors, I am unable to agree with the majority conclusion that "article X, section 2 [formerly art. XIV, § 3], enables the Legislature to exercise broad authority in defining *and otherwise limiting* future riparian rights, and to delegate this authority to the Board." (*Ante*, p. 351, italics added.) In my view nothing whatever in the language of the constitutional amendment supports such a proposition. As demonstrated above, the applicable cases expressly *deny* authority to limit or fix prospective riparian uses "until the need for such use arises," because at all times such uses remain "paramount to any right of the appropriator." (*Tulare, supra*, at p. 525.) Although a *presently exercised* riparian use must be "reasonable and beneficial" under the constitutional provision, no limitation or quantification of a reasonable *future* use is possible in light of the difficulty in predicting future needs. As quite properly observed by the recent *Soquel* court, "the possible future use of a riparian right cannot be anticipated, and obviously, to that extent, uncertainty exists as to what a court in the future may find to be reasonable and beneficial." (*In re Waters of Soquel Creek Stream System, supra*, 79 Cal.App.3d at p. 689.)

The majority at length deplores the uncertainty necessarily inherent in protecting unexercised, prospective riparian uses. Yet I strongly suggest that the constitutional rights which we have repeatedly acknowledged and defined may not be compromised, limited or ignored for reasons either of convenience or expediency. The recent *Soquel* case is directly in point, specifically holding that despite the desirability of affording convenient finality and certainty to competing water claims in a single administrative proceeding before the Board, nevertheless, "the state has chosen to give constitutional protection to unexercised riparian rights . . ." and accordingly these rights must prevail. (*Ibid.*) It is significant that we unanimously denied a hearing in *Soquel* on June 9, 1978.

The majority attempts to distinguish *Tulare* and subsequent cases on the ground that they involved "piecemeal adjudication" between some, but not all, competing claimants to a stream system. The majority advances the theory that since the present action is a statutory one aimed at resolving *all* claims, present and prospective, in a single administrative

proceeding, the established constitutional principles and protections announced by us in *Tulare* are inapplicable, and must yield. With due deference, I suggest that such reasoning is insufficient and inadequate. Once again, it should be emphasized that neither the Legislature through its enactment, nor this court by its decision, is empowered to limit or abridge *constitutional* property rights simply to promote the administrative convenience of the parties. If, as *Tulare* holds, the Constitution protects unexercised prospective riparian rights from being fixed or quantified until an actual need for such use arises, then such protection must extend to *all* types of proceedings initiated for that purpose, whether judicial or administrative, and regardless of the desirability of settling competing claims in a single neat and efficient proceeding.

Indeed, *Tulare* itself was a quiet title action brought against parties claiming an interest in the waters at issue. Among the litigants in that case were 16 appropriating corporations, 30 individual appropriators, 13 riparian or overlying owners, and a water district. (3 Cal.2d at p. 503.) Thus, in effect, the *Tulare* quiet title action was the substantial equivalent of the present statutory proceedings before the Board, for both proceedings were aimed at resolving *all* competing claims to a particular water system. As noted above, *Soquel* is directly on point, for it involved a Board proceeding commenced, as in the present case, under section 2500 et seq. of the Water Code. As explained, the appellate court rejected the contention that application of the underlying constitutional principles would vary depending upon whether or not the proceedings were aimed at settling the rights of all claimants pursuant to statutory proceedings before the Board. (79 Cal.App.3d at pp. 688-689.)

The majority argues that *Tulare* is further distinguishable on the basis that ". . . the statute therein treated the right as automatically abandoned as a result of 10 years' nonuse, without consideration of other needs and uses of the water in the stream system. The statute therefore was inconsistent with the mandate of the amendment to promote the reasonable beneficial use of state waters." (*Ante,* pp. 353-354.) The attempted distinction fails. *Tulare* expressly declared and recognized the continued and overriding vitality of prospective riparian rights and held that the 10 years' nonuse provision was unconstitutional *because it purported to interfere with these unexercised rights.* As we stated, ". . . such provision is contrary to the letter and spirit of the 1928 constitutional amendment, above discussed. *That amendment,* while limiting the riparian as against an appropriator, to reasonable beneficial uses, as likewise does section 11 of the Water Commission Act, *expressly protects the riparian not only as to*

*his present needs, but also as to future or prospective reasonable beneficial needs.* Since this is so, it would be incongruous and in violation of the spirit of the constitutional provision to hold that ten years' nonuse, without any intervening use giving rise to a right by prescription, constitutes a complete abandonment." (3 Cal.2d at p. 531, italics added.)

Finally, with due respect, I am unable to accept the majority's apparent assumption that the Legislature, in creating the statutory procedure at issue herein, intended to vest the Board with "broad authority . . . to define and otherwise limit the scope of a riparian's future right." (*Ante,* p. 349, fn. omitted.) Although the Water Code authorizes the Board to ". . . determine . . . all rights to water of a stream system whether based upon appropriation, riparian right, or other basis of right" (§ 2501) and to ". . . enter a decree determining the right of all persons involved in the proceeding" (§ 2768), another section of the code, adopted in 1943, provides that "In the enactment of this code the Legislature does not intend thereby to effect any change in the law relating to water rights" (§ 103). Moreover, it is noteworthy that although the reference in section 2501 to "riparian right" derived from a 1935 amendment to the former Water Commission Act, *Tulare* was decided earlier *that same year.* The reasonable inference is that the 1935 amendment was intended only to reflect *Tulare's* recognition that *presently* exercised riparian rights were subject to limitation and quantification in accordance with the reasonable and beneficial use doctrine adopted in 1928, and therefore that such riparian rights *to that extent* came within the Board's jurisdiction.

Thus, I conclude that the Board's statutory authority with respect to present or prospective riparian rights was intended to be, and is, confined by the standards and limitations announced by us in *Tulare.* In that regard, it seems to me unquestionable that the majority errs in concluding that the Board ". . . is authorized to decide that an unexercised riparian claim *loses it priority* with respect to all rights currently being exercised. Moreover, to the extent that an unexercised riparian right may also create uncertainty . . . and may thereby continue to conflict with the public interest in reasonable and beneficial use of state waters, the Board may also determine that the future riparian right shall have *a lower priority* than any uses of water it authorizes before the riparian in fact attempts to exercise his right." (*Ante,* pp. 358-359, italics added.)

As previously noted, *Tulare* stands for an entirely contrary principle. Under the rule which we therein announced, rather than limit or subordinate the priority of an unexercised, future riparian use, the Board

was, and is, empowered to do no more than "retain jurisdiction over the cause, so that when a riparian claims the need for water . . . [the Board] may determine whether the proposed new use, under all the circumstances, is a reasonable beneficial use and, if so, the quantity required for such use." (*Tulare, supra,* 3 Cal.2d at p. 525.)

I would reverse the trial court's judgment with directions to amend its decree in recognition of appellant's unexercised riparian rights and to retain its continuing jurisdiction in the event an exercise of those rights is eventually proposed.

Clark, J., concurred.

**MANUEL, J.,** Concurring and Dissenting.—I concur in the majority opinion insofar as it holds that the judgment of the trial court, upholding the Board's order of determination, must be reversed. I agree that although the subject provisions of the Water Code should not be interpreted to permit the Board to altogether extinguish the presently unused portion of a riparian right, they may be interpreted in a manner consistent with the relevant constitutional provision (Cal. Const., art. X, § 2; formerly art. XIV, § 3) to permit the Board to undertake a present quantification of the right in order to bring about certainty and thereby promote the efficient and beneficial use of the water resources of this state. I do not agree, however, that in the course of such a determination the Board has the power to fix such a right at the level of its present user and "determine that the future riparian right shall have a lower priority than any uses of water [the Board] authorizes before the riparian in fact attempts to exercise his right." (*Ante,* at p. 359.) In my view the exercise of such a power would be plainly inconsistent with the provisions of article X, section 2, of our state Constitution; the considerations which have led the majority to interpret the relevant Water Code provisions to preclude the extinguishment of the unused portion of a riparian right also demand that the same provisions be read to preclude the procedure here approved. I conclude, in short, that in permitting the Board to assign less than riparian status to the unused portion of a riparian right, the majority has essentially approved the extinguishment of that portion of the right—and thereby has reached a result inconsistent with its fundamental holding and the clear command of the Constitution.

Article X, section 2 of our Constitution provides as here relevant: "The right to water or to the use or flow of water in or from any natural stream

or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than [,] so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, *or may be made adaptable,* in view of *such* reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, . . ." (Italics added.) In my view this language, which is declared in the same constitutional provision to be self-executing, establishes two basic principles: (1) No right, whether riparian or otherwise, to the use of water in a natural stream or water course permits the unreasonable use of such water or the use of an amount greater than is required for beneficial uses. (2) A riparian right attaches to that amount of water which may be reasonably required for such beneficial uses as the riparian's land is presently or may in the future be made adaptable. Thus the constitutional provision both places restrictions on present user and establishes the scope of the riparian's entire right, looking in the latter respect to both present and future user.

I agree with the majority that the Legislature, in setting up a procedure for statutory adjudication of rights to water in a stream system, has acted in a manner consistent with these constitutional principles. I also agree that in the course of such a proceeding the Board is empowered to determine the nature and scope of *all* rights to water in a given stream system, whether riparian or otherwise. (See Wat. Code, §§ 2501, 2769.) This, in my view, is in no way inconsistent with the constitutional provision. I do not agree, however, that if the Board elects (see § 2501) to include *riparian* rights within its determination, it may act in such a manner as to effectively deny full riparian status and priority to the presently unused portion of any riparian right. The majority, in authorizing this result, reads the relevant legislation more broadly than the Constitution will permit.

Water Code section 2769 indeed provides that the decree of determination "shall in every case declare as to the water right adjudged to each party, the *priority,* amount, season of use, purpose of use, point of diversion, and place of use of the water; . . ." (Italics added.) The majority conclude, presumably on the basis of this language, that "the

Board is authorized to decide that an unexercised riparian claim loses its priority with respect to all rights currently being exercised" and that, to avoid harmful uncertainty, "the Board may also determine that the future riparian right shall have a lower priority than any uses of water [including appropriative uses] it authorizes before the riparian in fact attempts to exercise his right." (*Ante,* at p. 359.) When, we are told, the riparian at some future time proposes to exercise the portion of his right which has been thus "prioritized," the Board is to evaluate his proposed use "in the context of other proposed uses of water in the stream system, and to determine whether the riparian use should be permitted in light of the state's interest in promoting the most efficient and beneficial use of state waters." (*Ante,* at p. 359, fn. 15.) In making this determination, the majority states, "the Board may not grant the unexercised riparian claim a priority with respect to existing rights that is higher than it granted at the time the decree became final." (*Id.*)

In my view the foregoing has the obvious effect of downgrading the unused portion of a riparian right to less than riparian status. The riparian, when and if at some future time he determines to utilize some portion of his land which had previously remained unused, or to modify existing uses on his land, will be required to demonstrate to the Board not only that the amount of water claimed is "reasonably required for the beneficial use" he proposes (Cal. Const., art. X, § 2) but also that the proposed use, viewed in "the context of other proposed uses of water in the stream system, . . . should be permitted in light of the state's interest in promoting the most efficient and beneficial use of state waters." (*Ante,* at p. 359, fn. 15.) At this point, then, the riparian will stand on the same footing as the nonriparian. His unused riparian right, *insofar as it occupies the preferred riparian status contemplated by the Constitution,* will have been effectively extinguished. This, in my view, the Constitution will not permit.

I share the majority's concern—and that of the Board—over the severe problems of uncertainty caused by "dormant" riparian rights. As pointed out by the Governor's commission in its recent final report, such uncertainty not only hampers the local and statewide management and supervision of water uses but has historically resulted in recurrent and costly litigation. (Governor's Com. to Review Cal. Water Rights Law, Final Rep. (Dec. 1978) pp. 21-25.) Clearly one means of avoiding this uncertainty is through the unified statutory adjudication procedure contemplated by section 2500 et seq. of the Water Code, whereby the Board is empowered to "determine . . . all rights to water of a stream

system whether based upon appropriation, *riparian right,* or other basis of right." (§ 2501; italics added.) Insofar as this procedure contemplates a present quantification of *all* such rights, I perceive no constitutional impediment to it. Thus if the Board in its wisdom concludes that its determination shall include riparian as well as other rights, it may in my view undertake proceedings directed to this end. Insofar as any particular *riparian* right is concerned, however, the Board may not in my opinion undertake such a present quantification unless it is able to determine, on the basis of an adequate record, the amount of water that "may be required or used . . . for the [reasonable and beneficial] purposes for which such lands are, or may be made adaptable. . . ." (Cal. Const., art. X, § 2.)

We stated in *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489 [45 P.2d 972], in the context of a private adjudication, that the present determination of the scope and quantity of a riparian right must be limited to the extent of its present user, the trial court retaining jurisdiction to determine whether any proposed future riparian use is a reasonable beneficial use. "As to such future or prospective reasonable beneficial uses," we observed "it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises." (*Id.,* at p. 525.) This language, as I read it, does not represent constitutional interpretation; rather it is grounded in purely practical considerations. It may well be that a court, faced with a water rights dispute among competing litigants, riparian and otherwise, should conclude for reasons of institutional competence that a consideration of reasonable future uses lies beyond the proper scope of its inquiry. This does not necessarily mean, I would suggest, that the State Water Resources Control Board, in the context of a comprehensive proceeding directed to the determination of all rights to water in a stream system, must be similarly limited. The issue is a practical one: whether it be feasible or possible to develop evidence, opinion and otherwise, which would reasonably support a finding justifying present quantification of a riparian right in both its present and future aspects. The future aspect of that right, as described in the Constitution, includes that amount of water reasonably required for any reasonable and beneficial use to which the subject land may properly be made adaptable. In many cases it may well be possible, in light of evidence of historical and reasonably foreseeable future uses, to arrive at a reasonably accurate estimate of this amount. In other cases, owing to great diversity in foreseeable land use patterns in a given area, it may not be. In any event it is my view that the Constitution, as implemented by those provisions of the Water Code setting up the

procedure of statutory adjudication, permits the Board to undertake a determination of this kind in all cases in which it considers itself equipped to do so. Whether in any particular case the evidence before the Board supports the determination made is of course a matter for the courts.

It is clear that present quantification of water rights, to the extent that it may be achieved with respect to any particular stream system, will operate to foster that certainty necessary to the efficient administration and use of the waters within that system. To the extent that riparian as well as other rights can be quantified, the riparian owner and other interested parties will be made aware of the total amount of water comprehended within his right. The amount of any particular right that remains "dormant" under present use will become a sum certain, subject to negotiation and disposal by the owner to appropriators and other nonriparian users. There may of course be cases where a riparian owner of a quantified right may choose to retain the whole or a significant part of his entitlement, allowing the unused and untransferred portion to remain "dormant," but such cases will become rarer as such owners, assessing the present and projected uses of their lands, come to view their water right as a disposable asset of certain scope.

I conclude for the foregoing reasons that the Board, in the context of a statutory adjudication of rights to water within a given stream system, has the power to presently quantify all such rights—including the future aspect of riparian rights. The Constitution, as I read it, offers no obstacle to such a procedure, and the relevant statutes clearly contemplate it. What the Constitution does not permit, in my view, is the actual or virtual extinguishment of the future aspect of riparian rights—either through outright extinction or through the device, adopted by the majority, of consigning that aspect of the right to some lesser status, to be administered by the Board on the same basis as all other rights in the stream when the riparian proposes to use it. Under our Constitution the riparian right, in both its present and future aspects, is *primary* in priority. The majority, in allowing the future aspect of the right to be denigrated to a lower status, does so in the face of a clear constitutional command to the contrary.

I would reverse the judgment and remand to the trial court for further proceedings in light of the views herein expressed.

Appellant's petition for a rehearing was denied October 25, 1979. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.